## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>**Herman Eugene Lane** )<br>**12310 Ox Hill Road** )<br>**Fairfax, VA, 22033** )<br> )<br>**and** )<br> )<br>**Rachel Perry** )<br>**5335 Duke Street, Apt. 401** )<br>**Alexandria, VA 22304,** )<br> )<br>**Plaintiffs,** )<br> )<br>**v.** )<br> )<br>**Gaddi Vasquez,** )<br>**1111 20th Street, NW** )<br>**Washington, DC 20526** )<br> )<br>**The Director of the** )<br>**United States Peace Corps** )<br> )<br>**(sued in his official capacity))** )<br> )<br>**Defendant.** )<br>_____) | **Civil Action No.**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT</u>
### (Retaliation and Sex Discrimination)

**COME NOW** the Plaintiffs, Gene Lane and Rachel Perry, and in support of their causes of action allege as follows:

### <u>Parties</u>

1.     Plaintiff Rachel Perry ("Perry") is a Black, female, 34-year old  resident of Alexandria, Virginia.

2.     Plaintiff Herman Eugene Lane ("Lane") is a White, male, 54-year old resident of Fairfax, Virginia.

3.      Defendant Gaddi H. Vasquez is Director of the Peace Corps ("the Agency"), which is located in Washington, D.C.

4.      Vasquez is being sued only in his official capacity as the highest official of the Agency.

## Jurisdiction and Venue

5.      The Court has jurisdiction of the case under 29 U.S.C. Sec. 701, et. seq., 29 C.F.R. Sec. 1614.101, and 28 U.S.C. 1331, 1343(a).

6.      Venue properly lies in this Court because the controversy involves Defendant's discriminatory and retaliatory treatment of Perry, and Lane, with regard to her employment and his applications for employment at the Peace Corps, in the District of Columbia.

## Exhaustion of Administrative Remedies

7.      More than 180 days have passed since Lane, and Perry filed formal complaints of discrimination with the Agency's EEO office.

8.      By virtue of the foregoing facts, Lane and Perry are now free to exercise their private rights of action in the U.S. District Court and to obtain a trial *de novo*.

## The Facts Supporting Lane 's Claims

## LANE POSSESSES AN OUTSTANDING BACKGROUND FOR HUMAN RESOURCES POSITIONS

9.      Lane was a Peace Corps volunteer during 1980-1982 in the Dominican Republic, and an employee with Peace Corps at Peace Corps headquarters during 1986-1989.

10.     As a Peace Corps volunteer, Lane won a Certificate of Appreciation for his service in the Dominican Republic, signed by both the Peace Corps Director and

President Ronald Reagan.

11.     In his permanent employment with the Peace Corps in Washington during a previous tour of duty, Lane won an "Outstanding Performance Award. . . in appreciation and recognition of [his] Sustained Outstanding Performance of Duty," signed by then-Director Paul D. Coverdell.

12.     Lane is presently an employee of the Federal Aviation Administration.

13.     His current pay grade is the equivalent of a GS-14.

14.     Overall, Lane has over twenty years' experience as a personnelist.

15.     When he was previously employed with Peace Corps, Lane was a Human Resources Specialist.

16.     Among other accomplishments during that time, Lane developed and delivered staff training on personnel issues for Peace Corps personnel.

17.      Lane also advised management on conduct and performance related employee relations problems at the Department of Commerce between 1985-86.

18.     In applying for positions, Lane has always submitted a comprehensive SF-171, KSA's, and supplemental information specifically tailored to the positions in question.

### LANE IS EXPERIENCED IN PROVIDING GUIDANCE TO MANAGEMENT

19.     Lane has provided guidance on rules, regulations and guidance at the U.S. Office of Personnel Management, the Department of Commerce (NOAA), the Peace Corps, and the Federal Aviation Administration.

20.     In his prior tour of duty at Peace Corps, Lane advised management, including the Director on career (employee) development and other personnel issues.

21.     In his prior tour of duty at Peace Corps, Lane interpreted and explained

to management "the governing regulations, laws, rules and procedures which affected

Peace Corps personnel.

22.      He also researched and re-wrote the Peace Corps Manual, 171, p. 750,

and revised the "Overseas Staff Handbook,"

23.      At the Peace Corps, Lane met with Senior Level Executive Peace Corps

Managers on a daily basis to discuss personnel issues.

24.      Lane advised Peace Corps management on position classification issues

during his earlier tour of duty.

25.      At the FAA, Lane has consulted daily with FAA executives, managers,

employee relations and labor relations specialists, union representatives, EEO

counselors, and any other interested parties, concerning management and employee

relations issues.

26.      Lane also provided "expert advice and support to the FAA

Administrator, Associate Administrator for Human Resource Management, and other

agency executives on all SES operational personnel matters."

27.      At the FAA, Lane helped establish a new, innovative performance

evaluation system for all 50,000 agency employees.

### LANE IS EXPERIENCED IN DEVELOPING POLICY AND IMPLEMENTING HUMAN RESOURCES AND EMPLOYEE BENEFITS PROGRAMS

28.      During the period of his employment at the Federal Aviation

Administration, Lane has developed FAA-wide policy on SES personnel matters.

29.      At the FAA, Lane also managed the operations team's implementation of

"buyouts."

30.      Also at the FAA, Lane managed and developed a voluntary leave transfer

program, and developed standard operating procedures for the Senior Executive Staff.

31.    Also at the FAA, Lane developed and managed an alternative work schedule, and flexible work schedules.

32.    Lane handled complicated payroll issues at the Peace Corps.

33.    In employment at the Office of Personnel Management ("OPM"), the National Oceanic & Atmospheric Administration ("NOAA") the Peace Corps and FAA, Lane calculated salaries.

34.    At NOAA, the Peace Corps and the FAA, Lane determined service computation dates.

35.    At the FAA, in applying and interpreting statutes, regulations, the Federal Personnel Manual, FAA and OST Orders, letters and other guidance, Lane was called upon to identify complex issues affecting the workplace.

36.    At OPM, Lane advised numerous agencies on the use of Code of Federal Relations Title 5 and other laws, regulations and laws regarding staffing and recruitment.

37.    Generally, Lane has provided advice as a technical expert and advice to all FAA managers and employees.  At the Peace Corps, he provided guidance and interpretation regarding personnel policies for more than 200 American and Foreign Service employees located in over 70 overseas countries.  .

38.    Lane has also constantly and successfully advised management on numerous complex international and domestic personnel issues.

39.    Lane also has advised the Peace Corps Director and his staff on a variety of high-level personnel matters.

40.    Indeed, Lane performed employee relations duties at the Peace Corps.

41.     At the FAA, Lane provided expert advice and support to the FAA
Administrator, Deputy Administrator, Associate Administrator for Human Resource
Management, and other agency executives on all SES operational personnel matters.

42.     Lane also provided such advice at NOAA, where he briefed high-level
executives on personnel issues and projects.

43.     Lane has also advised management and employees regarding *career
development* options.

44.     At the FAA, Lane managed the agency SES Performance Management
and Recognition Systems (Performance management).

45.     In the area of training, Lane most certainly has provided technical
information, by developing and implementing training programs, and coordinating
quarterly meetings of the Executive Steering Committee on Training and Development
with the FAA's "highest level executives."

46.     On his previous tour of duty at the Peace Corps, Lane developed and
delivered staff training on personnel issues for Peace Corps personnel.

47.     Lane also presented Peace Corps Office of Personnel Management
sessions to all new overseas staff training participants.  This was a lecture that covered
all aspects of federal employment and was presented to new employees from all walks
of life.

48.     Lane has also developed training programs at the FAA's Accountability
Board and a program for FAA managers to "manage to budget."

49.     Lane also served the FAA as expert to representatives of other
offices/functions regarding position classification and position management.  .

50.     At NOAA (Department of Commerce), Lane provided guidance on

personnel regulations, laws, rules and procedures, and counseled management regarding employee and labor relations problems.

51.    Lane was responsible for labor and employee relations at a 300-employee branch of NOAA.  There, Lane dealt with problems such as AWOL, tardiness, failure to perform, etc.

52.    At OPM, NOAA, the Peace Corps, and the FAA, Lane supervised subject matter experts rating and ranking applicants on merit promotion rating panels.

53.    Lane also advised management on conduct and performance related employee relations problems at the Department of Commerce between 1985-86.

54.    At the FAA, Lane participated in a work group to develop and establish a new, innovative performance evaluation system for all 50k agency employees.

55.    At the FAA from 1989 to 1992, Lane's position was to develop and recommend agency wide policies and procedures in areas such as classification and pay.

56.    Lane specified on his KSA's that he developed rating standards and criteria, and evaluated employees and subordinates."

57.    Lane most certainly has provided technical information, by developing and implementing a variety of training programs.

58.    At the FAA, Lane also developed FAA-wide policy on SES personnel matters.

.

**LANE HAS STRONG SUPERVISORY EXPERIENCE**

59.     During the relevant period, Lane has been rejected repeatedly in his applications for Human Resources positions, despite easily meeting the qualifications required for the positions.

60.     Lane applied but was rejected, for positions at the Peace Corps as a supervisor that required past supervisory experience.  These included PC4-081, for which Sheila Clark was selected, PC3-006, for which Odessa White was selected, and PC3-007, for which Phnesha Barnes was selected.

61.     Lane supervised four persons as a Supervisory Personnel Management Specialist at the FAA between 1992 and 1994.

62.     From 1986 to 1989, at the Peace Corps, Lane frequently served as acting Director of the International Operations Branch of the Office of Personnel, where he would supervise up to 11 persons during most of 1988 and 1989.

63.     In addition, Lane has experience evaluating employees-- both at the Peace Corps and at the FAA.

64.     Lane was successful in that supervision.

65.     Accordingly, Lane should have been fully credited as having the experience and ability to supervise.

LANE  DEMONSTRATED DEEP EXPERIENCE AND ABILITY IN BOTH ORAL AND
WRITTEN COMMUNICATION

66.  At the FAA, Lane demonstrated that he had skill in presenting briefings and

presentations.

67.  At the Department of Commerce between 1985 and 1986, Lane made oral and

written presentations to management and employees on personnel topics, while

providing classification expertise was one of his duties.

68.  At NOAA, the Peace Corps and the FAA, Lane briefed high level

executives on personnel issues and projects.

69.  Lane wrote the annual FEORP report, a report to Congress on the status

of the employment of women and minorities at the FAA, and reports on the hiring and

placement of people with disabilities

70.  Lane wrote parts of the Peace Corps manual, and the Peace Corps

Handbook.

71.  Lane has extensive experience and ability in making presentations.

72.  Lane represented the FAA in meetings with the office of the Secretary of

Transportation, the Office of Personnel Management and other agencies on SES issues.

73.  Lane facilitated weekly meetings with senior managers to review

employee relations complaints and allegations.

74.  At the Department of Commerce (NOAA), Lane made oral and written

presentations on personnel topics to management and employees.

75.  At the Peace Corps Lane presented personnel management training to all

new personnel, from GS-9 to 15 (which would have included high-level managers).

76.  Lane provided staff training while at the Peace Corps.

77.  Lane has held annual Performance Review Boards.

78. Lane has facilitated team meetings.

79. Lane's experience as a university professor would obviously have been useful in demonstrating his ability to give presentations.

**80.** Lane's many professional writings evidence identification of complex issues.

## LANE POSSESSED SIGNIFICANT EXPERIENCE IN NEGOTIATION AND DISPUTE RESOLUTION

81. At the FAA, Lane worked "with interested parties to resolve" harassment, misconduct, and other employee relations issues.

82. At the FAA, Lane handled the termination of employees; one was fired for falsifying financial paperwork and the other for sexual harassment. Lane spent 25-30% of his time on employee relations during the year and a half that he was on that job.

83. Lane negotiated salaries at OPM, NOAA, Peace Corps, and the FAA.

84. Lane also negotiated for advertising for the recruitment of minorities, women, and people with disabilities, and assisted employees and managers accommodate employees with disabilities. Lane adjudicated classification appeals at the FAA between 1989 and 1992.

85. Lane also negotiated contracts at NOAA.

### LANE APPLIES FOR, BUT IS DENIED NUMEROUS POSITIONS

86.     On April 19, 2002, Lane applied to the Peace Corps for the position of Human Resource Specialist, HRM (FP-5/4/3), under vacancy announcement PC2-094.

87.     On May 1 and 2, 2002, Lane's application for PC2-094 was reviewed and ranked according to a crediting plan, by three panelists appointed by the Agency, namely: Walita Winslow, LaShawn Stone and Deanna Galbreath.

88.     Out of 12 candidates, Lane received the second highest overall score on five rating elements.

89.     Five candidates were interviewed and three were selected for positions under PC2-094. All three selectees were women: Braguinier, Jezek and Sanet. The three selectees all scored lower than Lane in the panel process.

90.     The only candidate who scored higher in the panel process, Theodus Drayton, a male, was also not interviewed or selected despite being recommended for interview by the panel.

91.     On June 21, 2002, Lane applied for the position of Assistant Director of Human Resources (PC2-133). Lane was interviewed September 20, 2002 by Janet Brown, Director of Human Resources, Keith Vance, Director of Administration, and Susie Shaloub of the General Counsels Office. Although Janet Brown stated that a decision as to selection would be made within the "next couple weeks," he received a letter of non-selection two days following the interview.

92.     On November 5, 2002, Lane wrote a letter to Peace Corps Director Vasquez, alleging that prior failures to select him for a position amounted to unlawful discrimination in selection.

93.     On November 5, 2002, Lane applied for the position of Lead Human Resource Specialist under vacancy announcement PC3-020.

94.     On November 7, 2002, Lane applied under vacancy announcements PC3-006 and PC3-007.

95.     On December 3, 2002, Peace Corps Director Vasquez responded to Lane's letter regarding discrimination.

96.     Wynelle Myers, who is female, was ultimately selected for the PC3-020 position.

97.     Myers' application fails to evidence any experience in classification or development of crediting plans.  In comparing Myers' application with Lane's, and comparing both against the crediting plan, Lane showed more experience than Myers on most, if not all, of the crediting elements.

98.     On January 22, 2003, Lane applied for the position of Human Resource Specialist (PC3-071w).

99.     Lane was interviewed for PC3-071w on March 7, 2003.  Contrary to its policy, the Agency failed to notify Lane as to whether he was accepted or rejected from the position.

100.    On January 25, 2003, two female candidates who had not previously protested discrimination, Odessa White and Anne Ross, were interviewed for PC3-006, Supervisory Human Resources Specialist.

101.    Two other candidates, one male and one female, were also interviewed for the position.

102.    Cathy Pearson personally selected the candidates to be interviewed under that vacancy announcement.

103.    Lane was not granted an interview for PC3-006 and was not selected.

104.    On February 12, 2003, Lane applied for the Human Resources Specialist position (PC3-077w). The Agency failed to select any of the candidates for the position. Instead of hiring Lane, they chose to re-advertise the position at a later date.

105.    On February 12, 2003, Lane was interviewed for PC3-007 with attorney Frank Sheed, Ms. Brooks and Ms. Pearson.

106.    On February 24. 2003, applicant Odessa White's references were checked by the Agency, and the Agency learned that White's performance in her then-current job was so poor that the employer stated that she would not have been hired by that employer again to perform the job.

107.    On March 7, 2003, White, a female with no prior EEO activity, whose performance had been directly excoriated by her then-current employer, was selected over Lane under Announcement PC3-006, despite the terrible employment reference she had received.

108.    The vacancy announcement for PC3-007 states that: "[a]pplicants must have 52 weeks of specialized experience". . . "[t]o be creditable, specialized experience must have been equivalent at least to the next lower grade in the normal line of progression."

109.    Phnesha Barnes, a female applicant without prior EEO activity, was ultimately selected for that position, while Lane was not.

110.    Barnes' application contains a document, which is equivalent to an SF-50 (the last page of the application).  The document indicates that Barnes' incumbent position at the Capitol Police was at the GS-11 level.

111.    The vacancy announcement for PC3-007 states that the position at Peace Corps is "equivalent to GS-13/14."

112.    Since Barnes had not served at the GS-12 level, she lacked the requisite time-in-grade to be eligible for selection for PC3-007 at the time of her selection.  Nonetheless, Barnes was selected over Lane for the position.

113.    In rating Lane's qualifications against the crediting plan for PC3-007, Pearson severely underrated Lane while overrating female competitors.

114.    Thus, Pearson failed to fully credit Lane for the experiences he included in his 171 (application for employment).

115.    Contrasted with Barnes' application, Lane showed more experience in performance management and evaluation; supervisory experience; speaking to high ranking or management officials on classification, staffing, and pay management policy; extensive experience in counseling Human Resources Rules, Regulations, and Guidance.

116.    On March 21, 2003, Janet Brown approved the selection of Barnes for PC3-007.

117.    On April 16, 2003, the Agency promulgated a vacancy announcement for an Associate Director for Management of Human Resources, PC3-102w, for an FP-3 position.  Such an appointment would have been a downgrade from Lane's then-current position at the FAA.

118.    On June 13, 2003, Lane and three other candidates were rated and ranked by a panel for a position in as a human resource specialist in the office of the Office of Human Resources Management, identified in its announcement as PC3-102w.

119.    The panel was comprised of Mr. Vance and Sylvia Lavelle. Lane was recommended for consideration by the panel.

120.    Two other candidates were also referred for consideration for the position, one of whom removed herself from consideration.

121.    On June 18, 2003, an EEO Counselor was assigned to Lane's complaint of discrimination.

122.    Pearson, Odessa White and Dave Dalton interviewed Lane for PC3-102w on July 1, 2003.

123.    On July 2, 2003, the EEO counselor interviewed Janet Brown regarding Lane's complaint.

124.    On July 18, 2003, agency EEO Director Shirley Everest corresponded regarding Lane's EEO complaint.

125.    On August 11, 2003, the Agency decided not to fill the position announced through PC3-102, Human Resources Specialist, even though Lane was available and over-qualified for the position.

126.    Comparing Lane's qualifications to the position description, it is apparent that Lane was well qualified for PC3-102, Human Resources Specialist.

127.    On July 28, 2003, the Agency published a vacancy announcement for PC3-230, seeking a Human Resource Specialist. Lane subsequently applied for the position even though it was at a lower grade than his then-current position at FAA.

128.    On August 21, 2003, Lane and four other candidates were rated by a panel consisting of Sharon Jenkins and Sheron Jackson for PC3-230.

129.    Lane received the second highest score from the panel, and was one of just three of seven applicants to be referred to the selecting official for consideration.

130.    On September 16, 2003, Janet Brown prepared a selection memo naming Kristine Smith as the selectee for PC3-230.

131.    However, when the selection was sent to the Office of Management, it was rejected for reconsideration of whether Smith was in fact the best-qualified candidate.

132.    Lane has never been informed by the Human Resources Office, of the status of his application for PC 3-230, and was apparently never selected.

133.    The Agency posted a vacancy announcement numbered PC3-278, on September 25, 2003.

134.    On October 2, 2003, Lane applied under vacancy announcement PC3-278 and submitted detailed KSA's.

135.    Lane was already working at the equivalent of an FP-2 at the time of these applications.

136.    On December 22, 2003, Lane interviewed for PC3-278 with Pearson, Barnes and Sheed.

137.    In or around December 2003, Agency officials called meetings for the express purpose of discussing cover stories for its refusal to hire Lane.

138.    Pearson told Rachel Perry that the Agency was "running out of reasons" to not hire Gene Lane, and needed to come up with some.

139.    On another occasion, Pearson has also stated that HR Director Janet Brown said that Gene Lane had filed an EEO complaint and was not to be hired.

140.    On January 7, 2004, Lane was interviewed for PC3-280, Lead Human Resources Specialist, FP-201-4, by Pearson, Madeleine Robinson and Odessa White.  He had submitted detailed KSA's.

141.    Lane has never received a further update or response after his interviews for PC3-278 and PC3-280 from the Peace Corps.

142.    The Agency published a vacancy announcement for PC4-081, a Supervisory Human Resource Specialist, FP-201- 3/2, on February 23, 2004.

143.    Lane applied and submitted detailed KSA's for PC4-081, which would have represented a lateral job move for Lane had he been selected.

144.    On or around March 25, 2004, a panel was convened to rate and rank applicants, consisting of David O'Neill and Sharon Jackson.

145.    Lane's composite score of 88.5 was the highest achieved by any candidate for the position at the FP-2 level.

146.    In candidate rating for PC4-081, Lane achieved the highest score on both the sixth and seventh elements.

147.    Lane and Ginger Thomas were recommended for interviews at the FP-2 level, and two others were also recommended at the lower FP-3 level.

148.    Sheila Clark, the eventual selectee, who is female and did not have prior EEO activity, was not recommended by the panel for an interview.

149.    Lane was interviewed by Sheed, White and Lavelle for PC4-081 on March 15, 2004.

17

150.    The position was the same one that White had encumbered after being selected under PC3-006.

151.    The Agency interviewed seven candidates, notwithstanding the paper panel's recommendation that more selective interviews be conducted.

152.    The Agency then interviewed five of the seven original interviewees for a second time.

153.    Pearson wrote a "summary of interview" for PC4-081that characterized Lane and the other male candidate disparagingly, while praising the female candidates.

154.    Despite having received the highest overall score for an FP-2 candidate from the rating panel, Lane was not among the five of seven who received a second interview.

155.    Lane received a letter dated May 12, 2004, stating that he was not selected for PC4-081.

156.    Sheila Clark was selected for the position despite being less qualified than Lane.

157.    On May 7, 2004, Lane applied for PC4-115w, a Supervisory Human Resource Specialist position in HRM.  On or about May 17, 2004, he received post card acknowledging that application had been received.  Lane has received no further communications concerning this position.

158.    On August 4, 2004, the Agency interviewed Lane for another position, PC4-149, which would have been a lateral job move for Lane had he been selected.

159.    Lane has never received any further response from the Agency regarding that position.

160.    Lane applied for the position of Supervisory Human Resource Specialist, HRM (E & LR) PC4-149w, which was open at the FP-2 level. Lane was interviewed by Cathy Pearson, Frank Sheed, and Phnesha Barnes, the incumbent of the position (who had been earlier selected over Lane as described above).  Lane has not been selected for the position.

161.    On or about August 10, 2004, Lane applied for PC4-201, Supervisory Human Resource Specialist.   On or about August 27, 2004, he received post card acknowledging that application had been received.  Lane has received no further communications concerning this position.

162.    On March 16, 2005, Lane faxed and emailed a letter to the Peace Corps, declining the Defendant's offer of a downgrade position, Human Resources Specialist, HRM (FP-4/3).  That was first and only position offered to Lane by the Peace Corps since he initiated his EEO activity.

163.    Lane was Interviewed for the position of Supervisory Human Resources Specialist, HRM (FP-3/2), under vacancy announcement No. PC5-047 on January 27, 2005, by Cathy Pearson, Frank Sheed, and Dave Dalton.  On March 18, 2005, Lane received a letter dated March 16, 2005, stating that that vacancy had been cancelled and re-advertised as PC5-135.  Lane applied under that vacancy as well, but has not been selected.

164.    Lane applied for the position of Supervisory Human Resources Specialist (Staffing and Classification), HRM, FP-3/2, under vacancy announcement No. PC5-147. He was interviewed on 05/02/05. However, on 05/13/05, Lane received a letter dated 05/11/05, informing him that he was not selected.

165.    Since 2002, the selections of which Lane is aware within the Human Resources office have all been of women who had not engaged in prior EEO activity; namely: Barnes, Myers, White, Smith, Sanet, Braguinier, Jezek, and Clark.

### FACTS CONCERNING PERRY'S CLAIM

166.    Perry began working for the Agency on or about April 21, 2003.

167.    During or around December 2003, Perry opposed discrimination and other unlawful personnel practices concerning filing false reports with the EEOC, deterring selection of disabled Peace Corps Volunteers, employees, and several applicants and complainants, including Stanley Lemons, Cowell, Capehart, Moran, Paula Dolan and Herman Eugene Lane.  Perry opposed and refused to meet for management's express purpose of creating false justifications not to hire Herman Eugene Lane.

168.    On January 13, 2004, Everest rescinded a previously provided workplace accommodation that had been provided to Perry on account of Perry's medical status.

169.    On January 27, 2004, Agency Human Resources Director Janet Brown improperly informed her staff regarding Perry's private medical status.

170.    That same day (January 27), Perry protested to EEO Director Everest that her rights under the Rehabilitation Act and HIPPA had been violated by Brown's actions.

171.    The next day (January 28), Perry protested to Associate General Counsel Frank Sheed that her rights under the HIPPA had been violated by Brown's actions.

172.    Perry subsequently sought training opportunities, each of which was denied or rescinded.

173.    On or around February 2, 2004, Human Resources Management doctored Perry's SF-52.

174.    On or around February 6, 2004, Perry informed Director Vasquez, General Counsel Tyler Posey and EEO Director Shirley Everest, that she intended to file an EEO complaint against the Agency.

175.    That same day, Perry was issued a bogus letter of counseling and admonishment by Defendant.

176.    On February 9, 2004, Perry requested a meeting with Director Vasquez to discuss Agency violations of Title VII and the Rehabilitation Act.

177.    The request for that meeting was denied.

178.    During mid to late February 2004, several legitimate leave requests for Rachel Perry were not approved.

179.    On February 20, 2004, Perry initiated her official request to enter the EEO pre-complaint process as a Complainant with the EEO office

180.    On February 24, 2004, Everest told Perry she could not enter the EEO process as a complainant.

181.    On March 4, 2004, Perry was again denied a requested meeting with Director Vasquez.

182.    On March 4, 2004, Everest cancelled Ms. Perry's scheduled meeting with EEO Counselors Scott and Jenkins for an initial EEO interview.

183.    During or around March 2004, EEO counselors were assigned to Perry's case.

184.    Jennifer Owens and the Office of General Counsel intimidated the EEO counselors assigned to Rachel Perry's claim.  The intimidation included, but was not

limited to, advising EEO Counselor Crystal Scott via phone and in person they were not to process Perry's EEO complaint

185.    During March 2004, Perry's assignments were changed suddenly.

186.    On March 4, 2004, Perry, via electronic mail, Perry advised Everest that, during a training, she gave the staff of Management Services information that violated MD-110 and CFR 1614.

187.    Members of Office of General Counsel were coercing Crystal Scott, an EEO counselor assigned to process Perry's her complaint.  Jennifer Owens also advised Scott, and another counselor that they were to meet with her weekly to discuss Perry's complaints.

188.    On March 5, 2004, Everest modified Perry's work hours and removed credit hours from her timesheet.

189.    On or around March 15 2004, Everest admitted directly that she had declined to promote Perry because Perry "had filed a complaint."

190.    On March 18, 2004, Everest told Perry that she was forbidden from participating in a Women's History Month commemoration at the Agency because she had filed an EEO complaint.

191.    On March 18, 2004, Perry sent additional information to various Agency officials regarding her EEO concerns.

192.    On March 23, 2004, Perry was denied a due promotion to GS-12, on account of her protected activities.

193.    On March 19, 2004, Perry requested the right to file a formal EEO complaint with the Agency.

194.    That same day, General Counsel Tyler Posey sent Perry a letter instructing her to stop informing the Director of Agency EEO violations.

195.    On or about March 25, 2004, Shirley Everest informed Perry that she could no longer participate in the Maxi-Flex work schedule.

196.    On April 6, 2004, Everest proposed to suspend Perry.

197.    On or about April 9, 2004, Everest, once again, denied Perry training opportunities for a demonstrably false reason, although other employees received similar training opportunities.

198.    On about April 16, 2004 Perry was instructed that, unlike other employees, she would no longer be permitted to accrue compensatory time (referred to in the Peace Corps as "credit hours").

199.    On about April 16, 2004, Jennifer Owens denied Perry's request to be removed from Everest's supervision.

200.    On or about April 20, 2004, Perry received further notice that Everest, as she promised, had failed to promote Perry to a FP-3.

201.    Everest improperly proposed a five-day suspension as punishment for Perry's legitimate complaints about unethical behavior she witnessed on or about April 16, 2004.

202.    Prior to April 21, 2004, Perry received only favorable reviews from the Agency.

203.    On April 21, 2004, Perry filed a formal EEO complaint with the Agency.

204.    On April 23, 2004, Perry filed her written, "formal" complaint of discrimination against the Agency, identifying The Goldsmith Law Firm as her counsel.

205.    On May 20, 2004, Perry responded to the Proposed Suspension, opposing it by letter.

206.    On May 21, 2004, only hours after informing Everest that Perry would be amending her EEO complaint to include additional retaliation, the Agency rescinded its proposed suspension of Perry, and instead proposed her termination, allegedly in part for the same conduct that had previously motivated only a proposed suspension.

207.    Perry amended her EEO Complaint to include the proposed termination and indefinite suspension pending termination, as further retaliatory acts against her.

208.    After Perry opposed the Agency's proposed removal, the Agency nonetheless placed her on indefinite unpaid leave and initiated a Foreign Service Grievance Board action for final removal.

209.    On July 24, 2004, Perry was retaliatorily denied a non-competitive promotional appointment under vacancy announcement PC4-183.

210.    During or around March 2005, while still officially on indefinite suspension, Perry learned that a form SF-50 was in her official personnel folder, which included inappropriate language, clearly intended to cast her in a negative light.

211.    The Agency presented its indefinite suspension and decision to terminate Perry's employment to the Foreign Service Grievance Board.

212.    Perry sought a stay of that action so that she could litigate the de facto termination and intended future termination in a legally available forum of her choosing.

213.    The Foreign Service Grievance Board denied Perry's request for a stay, affirming the Agency's argument that Perry could resign her employment if she did not

wish to litigate discrimination claims before an administrative agency with no expertise or formal jurisdiction in that area.

214.    Perry subsequently resigned the position from which she had been indefinitely suspended for approximately one year.

## STATEMENT OF CLAIMS

**Count I:        Retaliatory Failure to Select In Violation of Title VII and 29 C.F.R. 1614
(As to Plaintiff Lane)**

215.    Plaintiffs incorporate paragraphs 1-213 by reference.

216.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. prohibits employers from discriminating against any of his employees or applicants for employment...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this sub-chapter.

217.    As summarized above, Defendant retaliated against Plaintiff Lane by repeatedly rejecting his applications for employment despite his being the best-qualified candidate, on account of his protected activities. As a result of the retaliation imposed upon him, Lane has suffered considerable injury, both financially and emotionally.

**Count II:        Failure to Select In Violation of Title VII and 29 C.F.R. 1614, on
Account of His Sex (As to Plaintiff Lane)**

218.    Plaintiffs incorporate paragraphs 1-217 by reference.

219.            As summarized above, Defendant refused to select Plaintiff Lane for any position for several years, and have never offered him any position at the FP-2 level or higher, despite his repeatedly having been the best-qualified candidate. Defendant took this action against Lane on account of his sex.

220.        As a result of the retaliation imposed upon him, Lane has suffered

considerable injury, both financially and emotionally.

### Count III:        Failure To Promote Plaintiff Perry As Retaliation For Activities Protected By Title VII And 29 C.F.R. 1614

221.        Plaintiffs incorporate paragraphs 1- 220 by reference.

222.        As described above, Plaintiff Perry engaged in a variety of

protected activities in the spring of 2004.

223.        On or about April 20, 2004, Everest, as she promised, declined to

afford Perry the career ladder promotion to a FP-3 that Perry had earned.

224.        On July 24, 2004, Perry was retaliatorily denied a non-competitive

promotional appointment to GS-12 under vacancy announcement PC4-183.

225.        As a result of the retaliation imposed upon her by way or non-

promotion, Perry has suffered considerable injury, both financially and emotionally.


### Count IV:        Retaliatory Indefinite Suspension Without Pay and Constructive Termination, in Violation of Title VII and 29 C.F.R. 1614 (As to Plaintiff Perry)

226.    Plaintiffs incorporate paragraphs 1- 225 by reference.  Title VII of the Civil

Rights Act of 1964, 42 U.S.C. 2000e et seq. Title VII of the Civil Rights Act of 1964, 42

U.S.C. 2000e et seq. prohibits employers from discriminating against any of its

employees or applicants for employment...because he has opposed any practice made an

unlawful employment practice by this subchapter, or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under this sub-section.

227.        As summarized above, Defendant suspended Plaintiff Perry indefinitely

without pay from May 2004 through February 2005, for engaging in activities protected

by those provisions, thereby causing her severe harm.  The Agency ultimately forced Plaintiff Perry to resign, since she would otherwise have been compelled by the Agency to initially litigate her discrimination issues before the Foreign Service Grievance Board, thereby causing her further harm.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs, Herman E. Lane and Rachel Perry pray that the Court grant them the following relief:

(a)    A declaratory judgment that Defendant's conduct violated their rights;

(b)    Reinstatement of Plaintiff Perry and promotion to a FP-3 position or the position to which she would have ascended absent the retaliation from which she suffered, with full back pay and benefits.

(c)    Correction or deletion of SF-52 issued to Perry on or about March 2005.

(d)    Placement of Plaintiff Lane in a position at the FP-2 level, or the position to which he would have ascended absent the retaliation from which he suffered, with full back pay and benefits.

(e)    Compensatory damages for both aggrieved Plaintiffs, in amounts to be determined by the jury in accordance with the proof at trial, for the financial (including back pay and lost income) and emotional harm caused by Defendant;

(f)    Pre-judgment and post-judgment interest;

(g)    Reasonable attorneys' fees, expenses and costs;

(h)    Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation; and

(i)    Such other relief as the court shall deem just and proper;

### Jury Trial Demand

The Plaintiffs demand that this case be tried by a jury.


Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC


_____
Leizer Z. Goldsmith
1900 L Street, N.W., Suite 614
Washington, D.C. 20036
Telephone: (202) 775-0040
Facsimile: (202) 318-0798

Attorney for Plaintiffs Lane and Perry