### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____
                                            )
Herman Eugene Lane, et. al                  )
                                            )
        Plaintiffs,                         )
                                            )       Civil Action No. 05-01414 (EGS)
        v.                                  )
                                            )
Gaddi Vasquez,                              )
                                            )
        Defendant.                          )
_____)

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S
### MOTION FOR PARTIAL DISMISSAL AND TO SEVER CLAIMS

### INTRODUCTION

In this employment retaliation and discrimination action involving the contentions of two Plaintiffs, Lane and Perry, Defendant has moved to dismiss Perry's claim regarding her indefinite suspension without pay and Lane's complaint that he was discriminated against in selection with regard to vacancy announcement PC2-133, for failure to exhaust administrative remedies.  He has also moved to sever the two Plaintiffs' claims from one another's.  For the reasons set forth below, Defendant's Motion should be denied.

### ARGUMENT NO. 1:    PERRY SUFFICIENTLY EXHAUSTED ADMINISTRATIVE REMEDIES WITH REGARD TO THE INDEFINITE SUSPENSION WITHOUT PAY

29 C.F.R. § 1614.105 on "Pre-complaint processing" states that:

. . . (1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

The most critical contention in Perry's Complaint is that she has been retaliated against, culminating in an actionable "[t]ermination from the Agency pending review by the Foreign Service Grievance Board," otherwise referred to as an "indefinite unpaid suspension." Perry contends that this action was undertaken in retaliation for her protected opposition to unlawful discriminatory practices by the Agency, and her participation in proceedings caused by that unlawful conduct. This contention was contained in the Complaint Supplement she filed August 11, 2004 (Def's Exh. 6). It states:

> Instance 2: On May 21, 2004, approximately four hours after notifying Everest I would be amending my complaint to include additional instances of retaliation and reprisal and after receiving my attorney's response to my proposed five-day suspension, I was issued a proposed termination and was placed on administrative leave.

> Instance 3: July 2, 2004 Termination from Agency pending review by the Foreign Service Grievance Board.

As Defendant (Brf. at 12) has noted, that May action (Instance 2) may not have been a final adverse action, as it was merely a proposal which is generally understood as non-actionable in itself. For the purposes of MSPB jurisdiction, a suspension is statutorily defined as "the placing of an employee, for disciplinary reasons, in a temporary status without duties *and* pay." [Emphasis added.] See 5 U.S.C. § 7501(2). Paid administrative leave may not in itself constitute an adverse action. Henry v. Department of the Navy, 902 F.2d 949 (Fed. Cir. 1990). Accordingly, Plaintiff Perry's Complaint, ¶222, *asserts that it was the unpaid indefinite suspension of July 2, 2004, not the prior unpaid suspension, that constituted actionable adverse action*.

On July 2, 2004, the non-actionable proposal was implemented as a final decision. At that time, Perry was taken off the rolls, never to be permitted to report to

2

work again and never again to be paid.  Perry was effectively fired, even though she still

had the option of litigating in the future with Defendant to reverse the firing. Thus, the

July 2 termination pending review by the FSGB evidenced the finality necessary for an

adverse action, and Perry amended her EEO complaint within less than 45 days to

include the actions reflected in and flowing from that specific action which she

characterized as having occurred on the stated date of the termination memo.

Under the circumstances described, there can be no serious dispute but that

Perry suffered an adverse action or actions in the forms of the indefinite suspension and

termination, and that she timely notified the Agency that she was opposing those

actions and intended to litigate.  Accordingly, the Agency's Motion to Dismiss with

respect to the indefinite unpaid suspension of Perry must be denied.

It is undisputed that Plaintiff's timely EEO complaint of August 11 protested

the July 2, 2004 "[t]ermination from Agency pending review by the Foreign Service

Grievance Board."  Yet, Ms. Everest and her counsel (Brf. at 6, 12) disingenuously assert

that Perry never filed a complaint regarding the "Agency's decision to place her on leave

without pay pending a final determination of her proposed termination," but instead

only complained of the "decision to terminate her."

"Termination from Agency pending review by the Foreign Service Grievance

Board" obviously described the personnel action by which Defendant indisputably

removed Perry from the payroll and informed her in writing that she had no further

right of appeal within the Peace Corps, and instead would be unemployed and no

longer paid unless and until she could obtain reinstatement through litigation of the

propriety of her removal through formal legal proceedings at the Foreign Service

Grievance Board.  Thus, Defendant would have this Court require Plaintiff to inform

Defendant that she is contesting not just Defendant's adverse action against her ("termination pending review"), but each obvious consequence of such that Defendant itself already identified and described to Plaintiff in the complained-of action (no more work, no more pay), or otherwise have her case dismissed. Title VII contains no such requirement, and no court has ever imposed one either. This Court should not be the first.

A further important point must be made here. Under the regulations in question, the employee is required to provide the Agency with sufficient notice to permit the Agency to investigate the discriminatory acts alleged. Once that has been done, the regulations anticipate that the Agency can clarify any of the ambiguities — which will always be present in a complaint — through its investigation. In this case, wrongly, Defendant chose from the start not to investigate the allegations. However, even so, Defendant's knowledge and understanding of the Complaint was reflected soon after it was filed. As the D.C. Circuit has stated:

> Naturally every detail of the eventual complaint need not be presaged in the EEOC filing, but the substance of an ADA claim, like that of a Title VII claim, must fall within the scope of "the administrative investigation that can reasonably be expected to follow the charge of discrimination."

Marshall v. Federal Express, 130 F.3d 1095, 1098 (D.C. Cir. 1997).

Here, Defendant could have erased any confusion with regard to the scope of the adverse action of which she was complaining, simply by asking Plaintiff if she was alleging that the losses of work and pay were encompassed within her Complaint about the Notice of Termination (indefinite suspension). However, consistent with Defendant's overall approach of denying the existence of the claim and attempting to suppress it, Defendant did not seek any such clarification, or indeed, any clarification at

all. Instead, it notified Perry that it was dismissing the claim and proceeded to conduct its "investigation" without examining it.  See Letter of Delineation, Exh. 1 hereto. Defendant then argued that the termination pending review was non-exhausted to the administrative judge as well, before doing so before this Court.  Respectfully, this Court should put a stop to this litigation sleight-of-hand, and recognize that a complaint regarding termination obviously encompasses the losses of work and pay that a termination represents.

No Additional Exhaustion Was Required As To Termination or "Constructive Termination" of Perry

Defendant (Brf. at 12-13) further claims that Perry's constructive discharge contention also required a new complaint.  As an initial matter, even if this Court were to hold that Perry was required to initiate a new complaint when she submitted her resignation approximately ten months after being removed from the worksite and the payroll, as shown above, ***Perry has a viable claim on the indefinite suspension and loss of pay that resulted therefrom, such that Count IV certainly cannot be dismissed***.

Moreover, Plaintiff was absolutely asserting on August 11, 2004, that the actions taken against her through the Notice of Termination and their consequences were being challenged through the Amended EEO Complaint.  Constructive discharge was part of that complaint because discharge—though perhaps not of the classic "constructive" sort-- was in fact accomplished through the notice.  Thus, immediately upon receipt of the notice, Perry was no longer employed by the Agency.  She could not report to work and ceased receiving any pay.  The text of the notice informed her that this situation would only be reversed if she were to prevail against the Agency through a legal proceeding at some unknown time in the future.  The question presented, then, is

whether this meant that Perry's employment was "terminated" by the notice, "constructively terminated," or just suspended without pay.

The most obvious analogy to consider in deciding whether or not Perry was "terminated", is the more common federal employment procedure by which employees are "removed", such that they are no longer paid and no longer work, pending review by the Merit Systems Protection Board. Such employees are universally considered "terminated", and as such are permitted to litigate the validity of those terminations under civil service and EEO law. No one would seriously contend that such employees have not been terminated. The only difference between that procedure and the one called for by Defendant through its July 2, 2004 letter to Perry, was that *the Agency* was required to submit Perry's termination to the FSGB, whereas in the MSPB context, the *employee* must initiate the "appeal" in order for the propriety of the termination to be reviewed. In terms of compensation and work, however, the two main subjects of employment, there is absolutely no difference. Accordingly, there can be no doubt that Perry, while apparently still an employee for purposes of some Peace Corps records until she submitted her formal resignation nearly a year later, was terminated, whether that termination is characterized as temporarily, indefinitely or "constructively", when she received the July 2 letter. As her Complaint ¶ 222 states:

> As summarized above, Defendant suspended Plaintiff Perry indefinitely without pay from May 2004 through February 2005, for engaging in activities protected by those provisions, thereby causing her severe harm.
> . .

Whether what the Agency did on July 2 is viewed as a suspension or termination, the result is the same: an actionable adverse action that resulted in loss of income, as well as humiliation and indignity to Plaintiff Perry. Accordingly, Count IV

should not be dismissed, and Perry must be permitted to litigate the adverse action of which she complained on August 11, as well as the foreseeable and logical consequences of that adverse action.

The only case authorities cited by Defendant in support of dismissing Count IV, are <u>AMTRAK v. Morgan</u>, 536 U.S. 101 (2002) and <u>Keeley v. Small</u>, 2005 U.S. Dist. Lexis 18871 (D.D.C. 2005).  However, neither cited case supports the proposition for which it is in fact cited, namely, that a federal employee is required to recite not just the act by which she is aggrieved in her administrative complaint, but also the particular consequences of that act, or else see her complaint dismissed.  <u>Morgan</u> requires an employee to specifically allege and timely complain of discrete adverse actions, but Perry, as shown, most certainly did that here.  Accordingly, Defendant's citations are unavailing.

### ARGUMENT NO. 2:  LANE PRESENTED NUMEROUS ACTIONABLE CLAIMS, INCLUDING PC2-133, OF WHICH HE COMPLAINED BY LETTER TO PEACE CORPS DIRECTOR VASQUEZ

Plaintiffs listed many factual scenarios in his Complaint related to Defendant's failure to select and/or promote Lane.  In fact, there were even more selections that could have been referenced in the Complaint, had Plaintiffs' purpose been to illuminate *all* of the occasions upon which Lane was not selected. However, Plaintiff's intent in this case is not to litigate each and every failure to select as an actionable adverse action, but rather, to litigate some as adverse actions and to reference *some* others as evidence of Defendant's state of mind, motive and intent with regard to its discriminatory and/or retaliatory treatment of Lane.

*Defendant declined to move for dismissal as to Lane's claims of non-selection and/or promotion on positions PC3-020, PC3-006, PC3-007, and PC4-081.*  Accordingly,

it is undisputed that those claims remain to be litigated.  Plaintiff Lane maintains that

those are all actionable, non-time-barred adverse actions that are directly at issue.

Defendant also moved, however, to dismiss one claim that Plaintiff maintains is directly

actionable.

<u>Plaintiff's Claim Regarding Non-Selection for PC2-133 is Actionable</u>

On June 21, 2002, Lane applied for the position of Assistant Director of Human

Resources (PC2-133).  Lane was well qualified, and accordingly was interviewed on

September 20, 2002 by a panel of three, including Janet Brown, the Peace Corps' Director

of Human Resources.  Lane received a letter of non-selection two days following the

interview.  Complaint ¶ 91.

On November 5, 2002, Lane wrote a letter to Peace Corps Director Vasquez,

alleging that prior failures to select him for a position amounted to unlawful

discrimination in selection. Complaint ¶ 92;  Exhibit 2 hereto.  Specifically, the letter

stated that:

> . . . Like you, I love the Peace Corps, and I was a volunteer in the
> Dominican Republic from 1980-1982. I also worked at Peace Corps
> headquarters during the administrations of President Reagan and
> President George H.W. Bush. It was a joy working for them, and under
> the direction of Paul Coverdell, a man for whom I had a lot of admiration.
>
> I would also be honored to work for you. I have, however, had difficulty
> being considered for jobs under the merit promotion system in your
> Human Resource Management office.  Since March of 1996, I have
> applied to nearly 40 jobs at the Peace Corps, and I do not feel that I have
> ever received serious consideration. This is despite the fact that many of
> the jobs I applied for were in the same office where I worked before.
>
> …I believe that I am being discriminated against because I am a
> Republican, white, male, of Southern Anglo-Saxon ancestry, and older
> than the typical Peace Corps employee. In my opinion, it is hypocritical to
> promote diversity, and to then exclude highly qualified non-minority
> male employees from fair and open competition. As a result, I would like
> to request your assistance in returning to the Peace Corps to work. I have

a lot of knowledges, skills, and abilities that I would like to put to work helping you meet President Bush's goals for the Peace Corps, and I have included a copy of my federal application for your review. Please be cautious, however, with whom you share this letter, because I do not want to be retaliated against for expressing my beliefs.

Once again, I am very happy that you are the Director of the Peace Corps, and it would be a real pleasure to work for you, your staff, and President Bush. Please let me know if I can be of service to you, and I would very much appreciate your assistance.
….

Not having been offered any assistance in adjusting his Complaint by the Agency subsequent to his communication with Vasquez, on March 5, 2003, Lane contacted Everest's office to pursue his complaint of unlawful discriminatory non-selections. See Lane Affidavit ¶4 (Exhibit 3). Everest informed Lane that the EEO counseling process was available only for current Peace Corps employees. See Lane Affidavit ¶5. Lane subsequently filed a written complaint with Everest on March 24, 2003. Exhibit 4 hereto.

Defendant contends that Lane failed to exhaust administrative remedies as to PC2-133, specifically by not initiating EEO contact within the requisite 45 days, despite his having corresponded with the Director of the Agency and specifically asked for assistance in resolving his complaint of discriminatory failure to select. As an initial matter, Defendant provides the Court with a misleading expression as to when this non-selection occurred. Specifically, Defendant (Brf. at 2, 8) presents a premature date for the occurrence of the adverse action in question, referencing Lane's very equivocal statement provided to the EEO office setting forth the closing dates for *applications* to the positions he was complaining about, which he characterized as approximate dates of discrimination. Def's Exh. 1. In fact, it is indisputable that a complaint filed within 45 days of when the complainant was notified of the offending non-selection is timely.

Here, it is undisputed that the actual date of notification of the non-selection of Lane for PC2-133 was, as set forth in the Complaint, a couple of days after September 20, 2002, not June 25, 2002 as Defendant would prefer. Since the letter to the Director was sent on November 5, 2002, and that date is well within 45 days after September 22, 2002, Lane's initial contact with the Agency alleging discrimination was timely.

Defendant's Motion altogether ignored the fact that Lane sent his letter of complaint regarding discrimination and retaliation to the Peace Corps' Director on November 5, 2002. Because the letter clearly reflected a complaint of discrimination seeking remediation, that was filed with an appropriate person within the chain of responsibility for the Agency's EEO program, Lane satisfied his obligation of contacting the Agency within 45 days after the non-selection with respect to PC2-133, and that claim should not be dismissed. See Lloyd v. Chao, 240 F. Supp. 2d 1 (D.D.C. 2002) (Kessler, J) (sexual harassment victim's complaints to both her first and second-line supervisors constituted compliance with requirement that EEO contact be initiated within 45 days, since "an employee's contact with management officials is tantamount to initiating contact with an EEO counselor").[1]

**ARGUMENT NO. 3**: **DEFENDANT'S MOTION TO SEVER SHOULD BE DENIED**

Defendant (Brf. at 13) seeks to sever Perry's claims from Lane's and obtain separate trials. Defendant asserts that the claims do not arise out of a common transaction or occurrence, and do not present common issues of law or fact. Defendant's assertions are incorrect, and the claims should not be severed.

---

[1]      Notwithstanding Defendant's discussion of continuing violation theory (Brf. at 9-12), Plaintiff Lane has not relied on that theory in this case. Indeed, the word "continuing" does not appear in the Complaint.

PERTINENT FACTS OF LANE'S CASE FOR JOINDER PURPOSES

The facts of Lane's case are related to and intertwined with Perry's. As the Complaint notes, Lane is a former Peace Corps volunteer and employee. On November 5, 2002, Lane wrote a letter to Peace Corps Director Vasquez, alleging that prior failures to select him for a position amounted to unlawful discrimination in selection. He also initiated an EEO complaint against the Agency, by attempting to contact EEO Director Shirley Everest, who told him that since he was not an incumbent employee of the Agency, he could not file a complaint. Exhibit 3. He has subsequently applied for many positions with the Peace Corps, and been repeatedly denied. Lane alleges that the non-selections are retaliatory on account of his EEO protesting.

Janet Brown was Cathy Pearson's supervisor with regard to some of the vacancies from which Lane was denied employment. Pearson recommended that Brown not select Lane on PC3-007, and Brown followed the recommendation. Deposition of Catherine Pearson at 125 (Exhibit 5). After Brown left the Agency, Pearson became the Human Resources Director who, together with her subordinates, repeatedly denied Lane employment even when he was the best qualified candidate. Indeed, Pearson admitted at her deposition to at least five occasions upon which she declined to select Lane. Exhibit 5.

Brown stated in a meeting that Lane was not to be hired because he had filed an EEO complaint. Complaint ¶139. Pearson repeated that instruction to Perry. Id. Pearson herself expressed that Defendant was "running out of reasons" to deny selection to Lane, Complaint ¶ 138, and that she intended to meet with Everest (Perry's supervisor) and others regarding this intention to retaliate against Lane. Complaint ¶ 137.

Defendant's pretextual explanation for proposing to terminate Perry, which it later acted upon, focused on its contention that Perry had committed a form of misconduct by hiring Lane's counsel Goldsmith and its assumption that Perry shared information regarding Brown's and Pearson's retaliatory intent to deny Lane employment with Goldsmith. Exh. 6 hereto (proposed removal).

<u>PERTINENT FACTS OF PERRY'S CASE FOR JOINDER PURPOSES</u>

As the Complaint states, Perry, like Lane, initiated EEO activity against the Agency.  Perry, like Lane, attempted to communicate with Director Vasquez about the EEO problems, but as with Lane, he did nothing.

On December 22, 2003, Perry went to Catherine Pearson's office to discuss the Disabled Veterans Affirmative Action Plan. (Affidavit of Rachel Perry ¶ 4-18) Exhibit 7 hereto. While she was there, Pearson handed Perry a brochure that she said she had received from Gene Lane during a job interview, and asked her derisively if she wanted it.  Pearson said there would have to be a meeting about Lane because "we're running out of reasons not to hire him." Perry then changed the subject.  Exhibit 7.  Perry was invited to a meeting to discuss Gene Lane.  She called the EEOC that same day and spoke with the attorney of the day.  The attorney told Perry that any meeting whose purpose was to come up with nondiscriminatory reasons to justify not hiring someone would be unethical.  Perry declined to attend the meeting because she felt it would be unethical to meet with Human Resources regarding a job applicant with a current EEO complaint. Exhibit 7.

Later, Pearson came into Perry's office while Pearson was waiting to meet with Shirley Everest regarding Lane. Pearson asked why Perry would not be attending the meeting.  Perry told her she had too much work.  Pearson said again that the Agency

was running out of reasons to not hire Gene Lane, and needed to come up with some. At that point, Perry questioned Pearson's statement that Lane would not be hired, asking why the Agency would not just hire him if he was the best qualified for a position. Exhibit 7; Def's Exh. 3 ¶ 7-8. Perry received no satisfactory answer.

On another occasion, Pearson also told Perry that HR Director Janet Brown said that Gene Lane had filed an EEO complaint and was not to be hired. When Perry brought these matters up to the Office of Special Counsel, she was referred to the EEOC, where two attorneys of the day sent her back to an EEO counselor at the Peace Corps. Exhibit 7; Def's Exh. 3 ¶ 7-8. Both the EEO counselors and the EEOC attorneys of the day advised Perry that to have these matters addressed, she would have to file an EEO complaint, which she subsequently did.

On February 24, 2004, Everest improperly told Perry she could not enter the EEO process as a complainant. Complaint ¶ 180. On March 4, 2004, Perry was denied a requested meeting with Director Vasquez.

On or around March 15 2004, Everest admitted directly that she had declined to promote Perry because Perry "had filed a complaint." See Complaint ¶189. On March 23, 2004, Perry was denied a due promotion to GS-12, on account of her protected activities. Complaint ¶ 192. On or about April 20, 2004, Perry received formal notice that Everest, as she promised, had failed to promote Perry to a FP-3. Complaint ¶ 200.

Everest improperly proposed a five-day suspension as punishment for Perry's legitimate complaints about unethical behavior she witnessed on or about April 16, 2004. Complaint ¶201. On April 23, 2004, Perry filed her written, "formal" complaint of discrimination against the Agency, identifying The Goldsmith Law Firm as her counsel. Complaint ¶204. On May 21, 2004, only hours after informing Everest that Perry would

be amending her EEO complaint to include additional retaliation, the Agency rescinded

its proposed suspension of Perry, and proposed her termination instead.  Complaint

¶206; Exh. 6 hereto.

Defendant's alleged reasoning for firing Perry, as set forth in its Notice of

Proposed Removal, states in part as follows:

> **You have knowingly hired as your attorney the attorney who represents**
> **complainant Eugene Lane** in his complaint against the Agency and have
> provided him with confidential information, which you purport to be
> true, about the Lane case which you have learned through your position
> as EEO Specialist.  Along with your earlier breaches of confidentiality,
> this highly inappropriate action demonstrates to me that you are no
> longer fit to perform the basic functions of your job, which include
> learning confidential information in connection with EEO matters and
> maintaining its confidentiality.
>
> I no longer have confidence in your ability to maintain your impartiality
> in processing EEO complaints inasmuch as you have taken confidential
> information that you have learned in your role as EEO Specialist and
> provided that information to the complainant's attorney, thereby in
> essence assisting and advocating for the complainant in a manner that is
> entirely inappropriate and inconsistent with your responsibilities as an
> EEO Specialist.
> . . .
>
> You provided confidential information concerning Lane's case to Lane's
> attorney for use in your own EEO case, and presumably for use in Lane's
> EEO case as well.  This information was part of the Agency's deliberative
> process in responding to Mr. Lane's EEO claims, as well as making hiring
> decisions for positions to which he had applied.  As such, this is clearly
> "nonpublic information" as defined above, and it was improper for you
> to offer this nonpublic information to the attorney for a complainant
> against the government, who has an interest in attempting to use this
> information against the government's interests. . . Likewise, the law
> protects employees who engage in protected EEO activity from retaliation
> for such activities, however, you have not engaged in any protected EEO
> activity with respect to Mr. Lane.  Your actions are fundamentally
> inconsistent with your position as an EEO Specialist in which you are
> required, on a daily basis, to handle sensitive information that is part of
> the Agency's deliberative processes in an impartial and confidential
> manner, not to provide such information to counsel who are actively
> suing the Agency.

For the foregoing reasons, I am withdrawing your proposed suspension and proposing your termination from employment with the Peace Corps. . .

(Emphasis added.)  Notice of Proposed Removal (Exh. 8 hereto).

ANALYSIS

Rule 20, Federal Rules of Civil Procedure, on Permissive Joinder of Parties, states as follows:

(a) Permissive Joinder.

All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons (and any vessel, cargo or other property subject to admiralty process in rem) may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

(b) Separate Trials.

The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom the party asserts no claim and who asserts no claim against the party, and may order separate trials or make other orders to prevent delay or prejudice.

The purpose of Rule 20 is to promote trial convenience and expedite the final resolution of disputes, thereby preventing multiple lawsuits, extra expense to the parties, and loss of time to the court as well as the litigants appearing before it. "[U}nder the rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties, and remedies is strongly

encouraged." <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 724 (1966); <u>M.K. v. Tenet</u>, 216 F.R.D. 133, 137-138 (D.D.C. 2002), citing <u>Anderson v. Frances I. DuPont & Co.</u>, 291 F. Supp. 705, 711 (D. Minn. 1968). The determination of a motion to sever is within the discretion of the trial court.  <u>M.K. v. Tenet</u>, 216 F.R.D. 133, 137-138 (D.D.C. 2002); <u>In re Nat'l Student Marketing Litig.</u>, 1981 U.S. Dist. LEXIS 11650, 1981 WL 1617, at *10 (D.D.C. 1981) (Parker, J.).

    In this case, Defendants (Brf. at 13) seek to sever the two Plaintiffs' cases from each other, contending that they "do not arise out of the same transaction or occurrence and do not raise a common question of fact or law. . ." Defendant further asserts that the claims are insufficiently related, and simultaneously, that the jury might be "confused" in hearing them together.

    However, courts have frequently been presented with claims presented in a single case by several employment discrimination plaintiffs who experienced varied forms of discrimination at varied times, without severing those claims.  For instance, in <u>Hohlbein v. Heritage Mutual Insurance Co.</u>, 106 F.R.D. 73 (E.D. Wis. 1985), the district court held that an employer was not entitled to severance of an action brought by former employees, in light of common allegations of a continuing pattern of misrepresentation by the employer. There, four plaintiffs were employed by the defendant at different times and occupied different positions in its corporate structure. Nonetheless, the district court noted that in spite of the material dissimilarities between the substantive allegations, the four plaintiffs were properly joined. Id. at 78.  Similarly, the court in <u>M.K. v. Tenet</u>, 216 F.R.D. 133, 137-138 (D.D.C. 2002), noted that the joinder or non-severance of the six existing plaintiffs and their new claims under Rule 20(a) would "promote trial convenience, expedite the final resolution of disputes, and act to prevent

multiple lawsuits, extra expense to the parties, and loss of time to the court and the litigants in this case." M.K. v. Tenet, 216 F.R.D. 133, 141-143 (D.D.C. 2002).

LOGICALLY RELATED TRANSACTIONS OR OCCURRENCES

The first prong of the two-part Rule 20 test Rule 20(a) is also known as the "transactional test." Under that test, "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." M.K. v. Tenet, 216 F.R.D. 133, 137-138 (D.D.C. 2002), citing Mosley v. General Motors Corp., 497 F.2d 1330, 1331 (8th Cir. 1974) (citing 7 C. Wright, Federal Practice & Procedure § 1653 at 270 (1972 ed.). It requires a showing of 'logically related' events entitling a person to institute a legal action against another. "Transaction" may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." Boyer v. Johnson Matthey, Inc., 2004 U.S. Dist. LEXIS 9802 (D. Pa. 2004).

The presence of material dissimilarities between the substantive allegations of the joined plaintiffs does not automatically bring such claims outside the "same transaction or occurrence" language. Puricelli v. CNA Ins. Co., 185 F.R.D. 139, 142 (D.N.Y. 1999); Fong v. Rego Park Nursing Home, 1996 U.S. Dist. LEXIS 22289, *6, No. 95 Civ. 4445, 1996 WL 468660 (E.D.N.Y. Aug. 7, 1996). Blesedell v. Mobil Oil Co., 708 F. Supp. 1408, 1421-22 (S.D.N.Y. 1989); Hohlbein v. Heritage Mutual Ins. Co., 106 F.R.D. 73, 77 (E.D. Wis. 1985). The common transactions/occurrences needed for joinder need not be undertaken pursuant to an "official policy" of the employer. Fong v. Rego Park Nursing Home, 1996 U.S. Dist. LEXIS 22289 (D.N.Y. 1996).

In Tenet, defendants engaged in a repeated pattern of obstruction of counsel against the plaintiffs that established an overall pattern of policies and practices aimed

at denying effective assistance of counsel to the plaintiffs.  M.K. v. Tenet, 216 F.R.D. at 142.  The Court held that the repeated pattern of obstruction of counsel by the defendants against the plaintiffs was "logically related" as "a series of transactions or occurrences" that established an overall pattern of policies and practices aimed at denying effective assistance of counsel to the plaintiffs. M.K. v. Tenet, 216 F.R.D. at 142. Accordingly, the court determined that each plaintiff satisfied the first prong of Rule 20(a). Fed. R. Civ. P. 20(a).

In this case, Defendant had a policy—whether formal or not—of suppressing EEO complaints and severely punishing Plaintiffs for filing them.  Thus, as shown in the Complaint, after Lane filed his EEO Complaint, Brown told Pearson who told Perry that he was not to be selected because of that Complaint.  Def's Exh. 3 ¶ 7.  Pearson invited Perry to a meeting with Everest and others to discuss cover stories for why Lane would not be hired even when he was the best qualified.  Def's Exh. 3 ¶ 7-8.  Vasquez attempted to evade responsibility by simply responding to Lane's letter alleging discrimination by asserting that the Peace Corps did not discriminating and doing nothing whatsoever.

Perry opposed this course of action toward Lane, and was rewarded with a vicious pattern of retaliation against her.  She was instructed by Everest that she was forbidden from filing a complaint.  Def's Exh. 3 ¶ 26, 28. Then, Everest told her she would not be promoted because she filed a complaint.  She was instructed by Vasquez through his General Counsel to stop informing Vasquez about her complaints.  Finally, her employment was ended because she took her protests too far by opposing an unjust proposed suspension through representation by Lane's counsel.

The common transactions experienced by Lane and Perry are perhaps epitomized by Everest's edict was that, under her watch, there simply would be no EEO complaints. Def's Exh. 3 ¶ 3. Everest implemented this edict not only against Perry, but also by attempting to prevent Lane from vindicating his rights by falsely instructing him that he could not file an EEO complaint because he was not an incumbent Peace Corps employee. See Affidavit of Lane (Exh. 3 hereto). Viewed together, Defendant's actions illustrate the implementation of a policy of suppressing and punishing protected EEO activity, and thereby form a common factual scenario that satisfies the first part of the Rule 20 test, negating Defendant's argument for the claims to be severed.

Moreover, regardless of whether or not the cases are severed, under Fed. R. Evid. 404, Lane and Perry will each be offering admissible evidence at trial as to Defendant's retaliatory atmosphere, as expressed through Pearson's hostile treatment of complaints, Vasquez' inaction, Everest's view that complaints were to be suppressed, and Brown's vow not to select Lane. These and other facts drawn both directly from each Plaintiff's individual experience and from other related acts demonstrating retaliatory animus, will illustrate Defendant's intent to engage in acts of retaliation against those who would oppose it, its motive to do so, and its actors' states of mind as they impacted Defendant's actions directed toward both Lane and Perry. Some of this evidence will be in the form of admissions of a party opponent, and much such evidence will undoubtedly be ruled admissible here. Accordingly, there are unquestionably common transactions and occurrences relevant to both Plaintiffs' cases, and the claims accordingly cannot be severed for a failure to show a lack of common transaction or occurrence.

### COMMON QUESTIONS OF FACT OR LAW

The second part of the Rule 20 test is whether common questions of fact or law exist that would justify joinder. The "rule is satisfied if there is any question of law or fact common to all parties." Puricelli v. CNA Ins. Co., 185 F.R.D. 139, 143 (D.N.Y. 1999), citing Blesedell v. Mobil Oil Co., 708 F. Supp. 1408, 1422 (S.D.N.Y. 1989). Though not required, a unified policy, plan, or scheme of discrimination can satisfy Rule 20's commonality requirement. Porter v. Milliken & Michaels, Inc., 2000 U.S. Dist. LEXIS 11366 (D. La. 2000); Grayson v. K Mart Corp., 79 F.3d 1086, 1095-96 (11th Cir. 1996)

The claims of Perry and Lane, while not identical, are very closely intertwined. Both Plaintiffs' claims raise claims of nonselection or promotion on account of retaliatory and/or discriminatory animus. Both Plaintiffs present direct evidence that Agency officials decided not to promote them on account of their protected activity. Both Plaintiffs cite to transactions in which they attempted to obtain redress from the Director of the Agency, Mr. Vasquez, and his failure to respond. Both Plaintiffs present evidence that Shirley Everest, the EEO Director attempted directly to suppress their Complaints and preclude Plaintiffs from filing, by telling Lane that he was ineligible to complain because he was not a current Peace Corps employee, and by her telling Perry that she could not file a complaint either, implying that it was because she was herself an EEO Specialist. Both Plaintiffs present evidence that the Human Resources Director, Catherine Pearson, demonstrated to them that she was motivated to act against individuals who accused the Agency of discrimination by her willingness to participate in the retaliatory schemes of Brown and Everest. Accordingly, there are common questions of fact and law as to whether Defendant possessed a retaliatory motive against those who would make EEO complaints, including expression of those complaints

through direct statements of intent to retaliate specifically against Lane and Perry and attempts to suppress such complaints, and whether that motive was vindicated in an interconnected manner as to Lane and Perry.

In <u>Tenet</u>, <u>supra</u>, one question of law or fact common to each of the six existing plaintiffs was whether the defendants' notice restricting the plaintiffs' counsel from accessing records intruded on the plaintiffs' substantial interest in freely discussing their legal rights with their attorneys. Another was whether the "defendants [] engaged in a common scheme or pattern of behavior" that effectively denied the plaintiffs' legal right to discuss their claims with their counsel. The plaintiffs also alleged that the defendants' policy or practice of obstruction of counsel was "implemented through [a] concert of action among CIA management and the Doe Defendants," The court found these to be common questions of law and fact, concluding that the plaintiffs meet the second prong of Rule 20(a).

The <u>Tenet</u> court further noted that plaintiffs alleged common claims under the Privacy Act, that the defendants "maintained records about the plaintiffs in unauthorized systems of records in violation of § 552a(e)(4) of the Privacy Act" and that the defendants "failed to employ proper physical safeguards for records in violation of § 552a(e)(10) of the Privacy Act." The plaintiffs also alleged that the defendants wrongfully denied the plaintiffs and plaintiffs' counsel access to records in violation of § 552a(d)(1 of the Privacy Act and "illegally maintained specific records describing their First Amendment activities in violation of § 552a(e)(7) of the Privacy Act." Accordingly, the court concluded that the plaintiffs satisfied the second prong of Rule 20(a) and, thus, denied the defendants' motion to sever.  <u>M.K. v. Tenet</u>, 216 F.R.D. at 137.

Here, Defendant (Brf. at 15) essentially concedes that the requisite commonality exists (by noting the interconnection between Lane's and Perry's claims in its Memorandum), but mischaracterizes it as failing to show a common transaction or occurrence, or a common question of fact or law. Defendant (Brf. at 15, 17) asserts that this case is somehow lacking an essential element for joinder as to both common transactions and common questions because a "pattern or practice" has not been alleged. First, an employment discrimination need not allege a "pattern or practice" in order to satisfy either Rule 20(a) requirement. Second, while Defendant is correct that the Complaint does not state directly that it is one for a pattern or practice, as shown above, Defendant's behavior toward Lane and Perry are linked by numerous factual commonalities and numerous common management participants in the retaliation both Plaintiffs were subjected to.

Therefore, fairly read, the Complaint alleges, and we reaffirm here, that Defendant's personnel, including its Agency Director, Human Resources Director and Deputy Director, and EEO Director, engaged in a common practice of attempting to suppress EEO complaints and retaliate against those who would make them by taking adverse employment actions against such complainants. Lane and Perry were both victims of these practices. Accordingly, Defendant's argument that there exists no claim of a "pattern or practice," and that severance of the claims must therefore be undertaken, fails.[2]

---

[2]    Defendant (Brf. at 15) attempts to bolster this weak argument by mischaracterizing the Complaint here as showing commonalities between the Lane and Perry claims in just "three paragraphs of the 227-paragraph complaint." In fact, most of the Complaint's paragraphs show the commonalities, including the paragraphs showing Lane's qualifications for selection that were ignored by Defendant, the paragraphs showing Defendant's unlawful handling of Lane's applications by denying him interviews he was entitled to and selecting less qualified and sometimes patently unqualified applicants instead of Lane because of Lane's EEO activities,

Defendant (Brf. at 13), perhaps overtaken by a developing habit of self-serving misstatement, contends that Plaintiffs "do not even allege the same type of discrimination" and are therefore ineligible for joinder. However, a reading of the Complaint reveals that this is primarily a case of retaliation for EEO opposition and complaint filing as protected by Title VII. Both Plaintiffs engaged in such protected activity and maintain that they incurred adverse employment actions as a result.

Defendants (Brf. at 16) place reliance upon <u>Disparte v. Corporate Executive Board</u>, 223 F.R.D. 7 (D.D.C. 2004). In that case, plaintiffs intended to offer different evidence of racial discrimination concerning plaintiff Disparte, as compared to Cobb and Muhammad. Disparte's claims of racial discrimination were centered on the conduct of Ms. *Simkins,* alleging that she has a history of discriminating against African American employees and "treated Mr. Disparte coldly from the start." Cobb and Muhammad supported their claims with the conduct of Caceres, Fowler and Goode, in the harsher treatment of African American employees in the Operations Department and the racially insensitive remarks of Ms. Ruckel to the Operations Department staff. These distinctions, in contrast to the evidence Disparte proffered, resulted in severance of Disparte's claims from the claims of Cobb and Muhammad to avoid jury confusion and incurable prejudice to the defendant.

<u>Disparte</u> is distinguishable from this case. While in <u>Disparte</u>, there were apparently no allegations of a common factual scenario involving all three plaintiffs,

---

Defendant's shabby treatment of Lane in the interviews, Lane's and Perry's parallel attempts to engage the Agency Director, Vasquez, regarding the retaliatory conduct being directed at them, Everest's initial refusal to permit either Lane or Perry to enter the EEO process (See Affidavit of Lane, Exhibit 3 hereto), Defendant's ongoing attempt to defeat the claims by, in Lane's case, generating cover stories for failing to select him, and in Perry's, by interfering with the EEO process repeatedly and carrying out a pattern of retaliation in the workplace that culminated in the removal of Perry from the workplace.

critically, in this case, Plaintiffs' claims are centrally connected to a common evidentiary strand: Defendant's decision to retaliatory deny Lane employment through HR Director Pearson, Defendant's attempt to involve Perry in its unlawful behavior, and its retaliation against Perry when she would not do so and in fact filed her own EEO complaint regarding the retaliation against Lane. The pattern of retaliating against EEO complainants and suppressing their complaints was also commonly expressed against both Plaintiffs by EEO Director Everest. Moreover, the comments of former HR Director Brown, who actively retaliated against Lane and expressed her desire to continue doing so to Pearson, who told Perry that she was under Brown's instructions not to select Lane. Under the circumstances, Disparte is of no help to Defendant in attempting to obtain severance of these claims.

Defendant also relies on Grant v. Salem, 226 FRD 1 (D.D.C. 2004). Salem was a medical malpractice action in which the plaintiffs asserted joinder based on the fact that the doctor had performed the same type of surgery on each of them over a fifteen month period. Judge Leon severed the claims. Salem is distinguishable here. Unlike the instant case, although the Salem plaintiffs interacted with the doctor under similar circumstances, no plaintiff's claims became factually intertwined with another's. The sole connection was that a common tortfeasor had allegedly committed similar torts against several victims. This case contrasts clearly with Salem because here Perry was informed of Defendant's intent to retaliate against Lane, and was denied promotion, then terminated as a result of protected activity that included her contentions that the Agency was unlawfully retaliating in its actions against co-Plaintiff Lane. Accordingly, the claims asserted here by Lane and Perry cannot be severed on account of Salem.

## DEFENDANT'S "CONFUSION ARGUMENT IS BASELESS

Defendant (Brf. at 17), argues in the alternative that even if Rule 20(a) is satisfied, the claims should be severed because:

> [T]here is a significant likelihood that a single jury would be confused by the presentation of testimony by plaintiff Lane that the Peace Corps' Human Resources office discriminated against him for numerous jobs, while at the same time hearing evidence about Perry's complaints that her supervisor in the EEO office retaliated against her and otherwise denied her workplace benefits and improperly disciplined her.

Defendant offers not even any argument, much less evidence or factual proffer to support the self-serving conclusion that the jury would be "confused" by a common presentation of the facts regarding the retaliation and discrimination against the two Plaintiffs in this case. First, as shown at some length above, Defendant's characterization of these claims as wholly unrelated is self-evidently fiction. Defendant's own proposed removal of Perry indicates that she was being fired precisely because of the connection between her case and Lane's. Defendant's handling of Perry's complaints was of a piece with its treatment of Lane, and Defendant's serious campaign of retaliation against Perry began in earnest after she refused to participate in retaliation against Lane and spoke up against it. Moreover, even if there was any risk of "confusion", courts easily grapple with such risks through the use of necessary limiting instructions. Accordingly, the bald "confusion" contention is unavailing.

## CONSIDERATIONS OF JUDICIAL ECONOMY WEIGH HEAVILY AGAINST SEVERING THE CLAIMS

In considering the common issues of fact and the transactions or occurrences that impact the interests of judicial economy present in this case, the Court should consider the common witnesses who may be called upon to testify with regard to both Lane's and Perry's cases. When co-plaintiffs would use some of the same evidence to show a pattern

of discriminatory policies and practices, "[j]udicial economy would suffer" if co-plaintiffs' claims were severed from one another.   See <u>Disparte v. Corporate Exec. Bd.</u>, 223 F.R.D. 7 (D.D.C. 2004).  Here, both Plaintiffs' claims involve witnesses Lane, Perry, Brown, Pearson, Vasquez, and Everest.  Both claims will require factual inquiry into Defendant's direct expressions of retaliatory intent and Defendant's methods in handling EEO complaints.  Both claims will require discovery as to these overlapping central issues, pretrial and trial. Under these circumstances, joinder is proper and the claims of Lane and Perry should not be severed.

<u>**CONCLUSION**</u>

As we have shown, Plaintiff Perry properly exhausted her indefinite suspension without pay that resulted in her final termination.  Plaintiff Lane has properly exhausted administrative remedies as to at least six failures to select him and disclaims any intent to specifically litigate as discrete claims any of the other non-selections (although he intends to introduce evidence flowing from those actions to support the six claims), and must be permitted to continue litigating those claims.  The claims of Lane and Perry contain critical common transactions or occurrences, and common questions of fact and law.  Accordingly, Defendant's Motion should be denied.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC


_____

Leizer Z. Goldsmith
1900 L Street, N.W., Suite 614
Washington, D.C. 20036
Telephone: (202) 775-0040
Facsimile: (202) 318-0798

Attorney for Plaintiffs Lane and Perry